**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NATALIE SPENCE<br>2 Sterling Terrace, Unit D<br>Stratford, NJ 08084 | :<br>:<br>:<br>: |
|          Plaintiff, | :  No.: 19-21490-NLH-KMW<br>: |
|          v. | :  **JURY TRIAL DEMANDED**<br>: |
| **STATE OF NEW JERSEY**<br>d/b/a **NEW JERSEY STATE JUDICIARY**<br>125 West State Street<br>Trenton, NJ 08625 | :<br>:<br>:<br>:<br>: |
|      And | :<br>: |
| **NEW JERSEY STATE JUDICIARY**<br>125 West State Street<br>Trenton, NJ 08625 | :<br>:<br>:<br>: |
|      And | :<br>: |
| **JOHN CALLENDER**<br>In his Individual Capacity Only<br>Camden County Courthouse<br>101 South 5th Street<br>Camden, NJ 08103 | :<br>:<br>:<br>:<br>:<br>: |
|      And | :<br>: |
| **CORNELL WILLIAMSON**<br>In his Individual Capacity Only<br>Camden County Courthouse<br>101 South 5th Street<br>Camden, NJ 08103 | :<br>:<br>:<br>:<br>:<br>: |
|      And | :<br>: |
| **RENATA KIERSNOWSKI**<br>In her Individual Capacity Only Camden<br>County Courthouse<br>101 South 5th Street<br>Camden, NJ 08103 | :<br>:<br>:<br>:<br>: |
|      And | : |

**KELLY HELT** :
In her Individual Capacity Only :
Salem County Courthouse :
92 Market Street :
Salem, NJ 08079 :
:
    And :
:
**KAREN RUBINO** :
In her Individual Capacity Only :
Salem County Courthouse :
92 Market Street :
Salem, NJ 08079 :
:
    And :
:
**ELISABETH STORM** :
In her Individual Capacity Only :
Salem County Courthouse :
92 Market Street :
Salem, NJ 08079 :
:
    And :
:
**STEPHANIE HAWK** :
In her Individual Capacity Only :
Salem County Courthouse :
92 Market Street :
Salem, NJ 08079 :
:
    And :
:
**GLORIA GROSS** :
In her Individual Capacity Only :
Salem County Courthouse :
92 Market Street :
Salem, NJ 08079 :
:
    And :
:
**MARIA HINMAN** :
In her Individual Capacity Only :
Gloucester County Courthouse :
70 Hunter Street :
Woodbury, New Jersey 08096 :

|  |  |
|---|---|
| And | : |
|  | : |
|  | : |
| **JOHN DOES 1-10** | : |
|  | : |
| Defendants. | : |

## <u>SECOND AMENDED COMPLAINT</u>

**I.     JURISDICTION AND VENUE**

1.     Jurisdiction in this Honorable Court is based on violations of federal law conferred by 28 U.S.C. §1331.

2.     Venue appropriately lies in this district as that the events giving rise to the claims asserted herein occurred within this district.

3.     All conditions precedent, including the EEOC Rights to Sue, have been satisfied. See Exhibits A and B.

**II.    PARTIES**

4.     Plaintiff, Natalie Spence, is an adult individual currently residing at the above-captioned address.

5.     Defendant, State of New Jersey is a government entity doing business at the above-captioned address.

6.     Defendant, New Jersey State Judiciary is an entity existing by virtue of and operating under the laws of the State of New Jersey doing business at the above-captioned address.

7.     Defendant, John Callender, is an adult individual who has a primary office at the above-captioned address. Defendant, John Callender is named herein in his individual capacity only. At all material times, Defendant, John Callender acted unlawfully under the color of state law.

8.      Defendant, Cornell Williamson, is an adult individual who has a primary office at the above-captioned address. Defendant, Cornell Williamson is named herein in his individual capacity only. At all material times, Defendant, Cornell Williamson acted unlawfully under the color of state law.

9.      Defendant, Renata Kiersnowski, is an adult individual who has a primary office at the above-captioned address. Defendant, Renata Kiersnowski is named herein in her individual capacity only. At all material times, Defendant, Renata Kiersnowski acted unlawfully under the color of state law.

10.     Defendant, Kelly Helt, is an adult individual who has a primary office at the above-captioned address. Defendant, Kelly Helt is named herein in her individual capacity only. At all material times, Defendant, Kelly Helt acted unlawfully under the color of state law.

11.     Defendant, Karen Rubino, is an adult individual who has a primary office at the above-captioned address. Defendant, Karen Rubino is named herein in her individual capacity only. At all material times, Defendant, Karen Rubino acted unlawfully under the color of state law.

12.     Defendant, Elisabeth Storm, is an adult individual who has a primary office at the above-captioned address. Defendant, Elisabeth Storm is named herein in her individual capacity only. At all material times, Defendant, Elisabeth Storm acted unlawfully under the color of state law.

13.     Defendant, Stephanie Hawk, is an adult individual who has a primary office at the above-captioned address. Defendant, Stephanie Hawk is named herein in her individual capacity only. At all material times, Defendant, Stephanie Hawk acted unlawfully under the color of state law.

14.     Defendant, Gloria Gross, is an adult individual who has a primary office at the above-captioned address. Defendant, Gloria Gross is named herein in her individual capacity only. At all material times, Defendant, Gloria Gross acted unlawfully under the color of state law.

15.     Defendant, Maria Hinman, is an adult individual who has a primary office at the above-captioned address. Defendant, Maria Hinman is named herein in her individual capacity only. At all material times, Defendant, Maria Hinman acted unlawfully under the color of state law.

16.     Defendants, John Does 1-10, is a moniker/fictitious name for individuals and entities currently unknown but will be substituted when known, as affiliated, associated or liable hereunder for the reasons set forth below or inferred therefrom. Each of these parties are incorporated as Defendants in each and every count and averment listed above and below. Upon information and belief, Defendants, John Does, were agents, servants, workmen, or employees of Co-Defendants, liable to Plaintiff hereunder.

## III.    OPERATIVE FACTS

### SEXUAL HARASSMENT

17.     On or about June 26, 2017, Plaintiff, Natalie Spence was hired as a Judiciary Clerk 2 in the Camden Vicinage Child Support Division of the Camden County Probation Department.

18.     Plaintiff, Natalie Spence's supervisor at the time was Defendant, Renata Kiersnowski.

19.     Defendant, Kiersnowski assigned Defendant, John Callender to train Plaintiff, Natalie Spence with, upon information and belief, knowledge that Defendant, John Callender had previously sexually harassed female co-workers in the past.

20.     Upon information and belief, Defendant, John Callender has a prior, documented history of sexually harassing fellow female co-workers that had been inadequately addressed.

21.     Within a few days of beginning her new job, Defendant, Callender began to sexually harass Plaintiff, Natalie Spence. Defendant, Callender continued to sexually harass Plaintiff, Natalie Spence on a regular basis until her transfer to Salem County Superior Court.

22.    For example, while Plaintiff, Natalie Spence was sitting at her cubicle, Defendant, Callender approached Plaintiff, stood in front of Plaintiff with his groin in close proximity to Plaintiff's face began asking her inappropriate, personal questions and attempted to inappropriately touch her.

23.    Callender would repeatedly say he knows that Plaintiff "wants it" and he "could feel it."

24.    Callender would stand next to Plaintiff and ask what is her status: single, married, or a lesibian?

25.    Callender would ask Plaintiff, "what's your nationality?"

26.    Callender would get on his knee next to Plaintiff while she was in her chair, acting like he was helping Plaintiff in a condescending way. He would kneel in a way to align his private parts with Plaintiff's private parts.

27.    Callender's conversation would consistently lead to a sexual conversation.

28.    When was assigned to be trained by Callender. From the start of Callender being assigned to train Plaintiff, he started making sexually harassing comments.

29.    During the week, Plaintiff worked together with Callender about 4 times a week. Callender would sexually harass Plaintiff on almost every occasion that he worked with her.

30.    For example, they would be in the filing unit often for 2-3 hours, and Callender would consistently stand physically behind Plaintiff, very closely, in small isles. He would turn his body towards until Plaintiff felt his genitals against her. This unwanted physical sexual contact happened at least 4 times in the filing area.

31.    When Plaintiff's co-workers would go out to lunch, Plaintiff would stay at work and was alone. Then Callender would walk by Plaintiff and blow a kiss with a smooching sound in an

antagonizing way. Callender knew Plaintiff did not like it, but he continued. This happened almost every day, even when Callender was not assigned to work with Plaintiff.

32.     If other people were around, Callender would wink or blow Plaintiff a kiss without the noise effect and stick his tongue out.

33.     Callender would also loom over Plaintiff's chair in her personal space.

34.     Callender is about 6' tall and around 200 pounds, He is a large man. He would come to work ungroomed, unkempt, compared to everyone else who dressed professionally for an office environment. He would stand out because of the way he looked. He would make strange stares at Plaintiff. Had had ungroomed dreadlocks, and he smelled like cigarettes. To Plaintiff, he was a very imposing person with weird behavior. He presented himself in a scary way.

35.     Plaintiff would see Callender every day.

36.     Plaintiff became depressed and felt targeted by Callender. Plaintiff would ask herself, why this was happening to her? She came to her new job with a lot of enthusiasm, wanting to work for the courts, which is a hard position to get. Callender was putting Plaintiff in a situation where Plaintiff felt horrible at work. Plaintiff was fearful, not sleeping well, thinking and worrying about what will Callender do the next day.

37.     Plaintiff would constantly go back to her supervisor, Kiersnowski to complaint about Callender's behavior.

38.     Plaintiff became overwhelmed because she felt she was going to Kiersnowski too much. She feared she would be terminated.

39.     Plaintiff began focusing on Callender's behavior, and not paying attention to her work. She felt alone. She had to deal with Callender on her own because Kiersnowski was not doing anything to stop Callender.

40.     Callender knew Plaintiff complained to Kiersnowski and would tell Plaintiff, "they are not going to believe you; you will just be put on probation."

41.     After Plaintiff would complain, Callender came back to Plaintiff and said, "don't waste your time." Callender even walked past Plaintiff during the frequent complaints to Kiersnowski. He would say, "she's in here complaining, really?"

42.     At one point, Kiersnowski told Plaintiff she would tell Callender to stay away completely, but that never happened.

43.     Plaintiff felt like she was in a brainwashing environment where her supervisor and Callender would act like this behavior was acceptable, but Plaintiff knew it was not. The harassing behavior by Callender never ended until Plaintiff transferred from that department.

44.     Plaintiff felt Kiersnowski clearly knew what Callender was doing and allowed him to do it, at Plaintiffs expense.

45.     Plaintiff feared Callender. Plaitniff told Kiersnowski she felt threatened and feared Callender would do something to physically harm her. On multiple occasions, Kiersnowski said Callender was harmless, but Plaintiff feared for her physical safety. Plaintiff did not know what he was capable of. If Plaintiff saw Callender coming, Plaintiff would go the other way. Plaintiff did not feel comfortable working with Callender, but she had no choice because she was assigned to him. Kiersnowski never made any changes to the assignment.

46.     Callender made Plaintiff uneasy, and gave her anxiety, because she did not know what each day was going to bring. What will he do? How far will he take it? What could happen because there are no cameras in their location? Plaintiff could not focus because of that fear – what will he do next? Walking into work put a tight feeling in her chest.

47.    Plaintiff would ask to work the front desk just so she did not have to work with Callender. She would ask for different job assignments to get away from him.

48.    Plaintiff also had anxiety because she was in a new job, and felt a lot was on the line, Kiersnowski acted like Plaintiff was overreacting, and told Plaintiff to get used to it. Kiersnowski was dismissive. Plaintiff knew Callender was wrong but felt like she also wanted to please people at her new job.

49.    Callender made physically contact with Plaintiff. There were at least 10 unwanted physical touchings – none of which are appropriate in any workplace – from pulling Plaintiff's writs, to brushing up against her with his genitals when they were in close proximity. He would also brush up against her shoulders. Callender made Plaintiff feel a lump in her throat. He touched her in a bold and confident way.

49.    Plaintiff eventually stopped going to the woman's bathroom because it was across from the men's bathroom and Plaintiff was scared Callender was going to follow her inside. Rather than use the bathroom, out of fear, Plaintiff would hold the need to relieve herself which was painful.

50.    Plaintiff often cried.

51.    Plaintiff received counseling and therapy to treat for her emotional distress from the sexual harassment she experienced from Callender. Plaintiff needed to and did discuss these incidents with a professional.

52.    Plaintiff, Natalie Spence immediately reported Defendant, Callender's behavior to Defendant, Kiersnowski. Plaintiff, Natalie Spence advised Defendant, Kiersnowski that Plaintiff felt threatened by Defendant, Callender.

53.    Rather than appropriately addressing Plaintiff, Natalie Spence's legitimate concerns, Defendant, Kiersnowski told Plaintiff that Defendant, Callender was not a threat, but rather that Defendant, Callender had some personal setbacks and to be patient with him.

54.    Defendant, Kiersnowski informed Plaintiff, Natalie Spence that she would speak with Defendant, Callender to address his behavior. Upon information and belief, Defendant, Kiersnowski failed to speak with Defendant, Callender, failed to file a formal report, and ultimately allowed Defendant, Callender's sexual harassment to continue.

55.    In fact, during a subsequent investigation by Defendant, State of New Jersey's EEO Office, Defendant, Kiersnowski covered up her negligence and falsely stated that she did not recall the foregoing report by Plaintiff, Natalie Spence.

56.    Over the course of the following weeks, Defendant, Callender continued to sexually harass Plaintiff, Natalie Spence making evident that any actions taken by Defendant, Kiersnowski was inadequate.

57.    During the following weeks, Defendant, Callender (i) would approach Plaintiff, Natalie Spence from behind and push his groin into her while Plaintiff was attempting to file paperwork into a cabinet or other activities; (ii) would attempt to make unnecessary and off-pitting physical contact; and, (iii) would blow kisses at Plaintiff.

58.    On multiple occasions, Plaintiff, Natalie Spence told Defendant, Callender that his behavior was inappropriate and unwelcomed. On multiple occasions, Plaintiff, Natalie Spence told Defendant, Callender to stop touching her and to stop all unprofessional contact with her.

59.    However, on each such occasion, Defendant, Callender responded, telling Plaintiff, Natalie Spence that no one would believe her since Plaintiff was on probation (due to recently being hired).

60.     This response chilled Plaintiff, Natalie Spence particularly due to Defendant, Kiersnowski previously blowing-off Plaintiff's initial report.

61.     On or about July 20, 2017, during the annual Probation Division BBQ, Defendant, Callender again approached Plaintiff, Natalie Spence and made sexually offensive comments and gestures to Plaintiff using a hot dog.

62.     Later, during the annual Probation Division BBQ, Defendant, Callender again approached Plaintiff while in his undershirt and again made sexually offensive gestures towards Plaintiff, Natalie Spence's direction while straddling a chair.

63.     Defendant, Callender then, while staring at Plaintiff, Natalie Spence, stood, put on his workshirt, unzipped his pants, and began tucking in his shirt while making sexual noises.

64.     <u>The same day as this incident</u>, Plaintiff, Natalie Spence immediately reported the incident to Defendant, Kiersnowski and expressed her concerns and the ongoing harassment by Defendant, Callender.

65.     Upon information and belief, Defendant, Kiersnowski again failed to take any action with regards to Defendant, Kiersnowski. Instead, the victim was blamed.

66.     Plaintiff, Natalie Spence began experiencing retaliation from her supervisors and co-workers.

67.     <u>On July 21, the day after Plaintiff complained about the aforesaid sexual harassment at the BBQ</u>, Defendant, Kiersnowski completed a career progression report, stating that Plaintiff, Natalie Spence did not meet expectations in various areas in retaliation for Plaintiff, Natalie Spence's second report concerning Defendant, Callender.

68.     <u>That same day, on July 21,</u> Plaintiff reported Defendant, Callender's behavior to Defendant, Cornell Williamson.

69.     That same day, on July 21, Plaintiff was told that she would be transferred.

70.     Plaintiff's transfer went into effect on August 7, 2017, but the decision was made on July 21 – the day after Plaintiff's complaint of sexual harassment (and the same day as the false negative performance report).

71.     In fact, Plaintiff later learned that human resources said she cannot have an evaluation before she has been with the company for 60 days. The negative performance report was a retaliatory sham.

72.     Defendant Williamson had Plaintiff, Natalie Spence transferred to the Administration Unit of the Camden County Probation Department.

73.     Defendant, Callender continued to work in the same position, upon information and belief, without any reprimand.

74.     However, by the point, word had apparently been spread that Plaintiff, Natalie Spence was trouble, causing other co-workers to treat Plaintiff with hostility and supervisors to transfer Plaintiff to a third unit before Plaintiff was transferred to Salem County Superior Court.

75.     In fact, on or about May 31, 2018, Plaintiff, Natalie Spence came to work to find a drawing had been placed on her desk. The drawing depicted a stick figure traveling from Building 5 (Child Support Unit) to Building 6 (Juvenile Probation) stating "when it rains, it pours."

76.     Plaintiff, Natalie Spence continued to be ostracized by her co-workers and supervisors until her transfer to Salem County Superior Court.

## Race and Disability Discrimination

77.     On or about October 1, 2018, Plaintiff was transferred to the Salem County Courthouse and was promoted from a Judiciary Clerk 2 to a Judiciary Clerk 3.

78. Plaintiff was the only African American clerk amongst three Caucasian clerks. Unlike the other two clerks, Plaintiff was not given a cubicle but was assigned to sit at the front desk customer service window and was not given any personal workspace.

79. Since Plaintiff did not have any personal workspace, Plaintiff began eating her lunch in a vacant cubicle because the courthouse did not have a break room/cafeteria and Plaintiff did not want to eat at the customer service window. The other clerks had their own cubicles and that is where they ate. About two weeks after Plaintiff began using the vacant cubicle for her lunch break, Defendants Helt and Rubino started to stack old supplies, archived documents, and boxes in the cubicle. Upon information and belief, this was done to deter Plaintiff from eating her lunch in that cubicle.

80. Since Plaintiff was no longer able to use the cubicle for her lunch break, she began using a vacant desk at the back of the office. However, shortly thereafter, Defendants Helt and Rubino began piling materials and boxes on top of that desk as well.

81. Plaintiff reported the actions of Defendants Helt and Rubino to Defendant Gross. Defendant Gross acknowledged what Defendants Helt and Rubino were doing but informed Plaintiff that there was nothing she could do about it.

82. Shortly thereafter, Defendants began taking racially discriminating actions against Plaintiff. These actions include but are not limited to:

    a. After learning that Plaintiff's parents are Jamaican, Defendant Helt referred to Jamaica as a place people go to hide after they commit crimes.

    b. Defendant Rubino would say that if her husband got angry enough, she could see him lynching/stoning someone.

c. When minorities came in to inquire about a wage execution, after the person left, Defendants Rubino and Helt would say, "a wage execution, you mean an execution."

d. Defendant Helt asked Plaintiff if she spoke Geechee.

e. Defendant Helt told Plaintff she should visit the Salem County Clerk's Office because they maintained records of slaves and slave owners.

f. Judge Chetney's secretary once commented that a Muslim man dressed in Muslim garb and a kufi looked like a KKK member. Plaintiff reported this incident to her direct supervisor, Defendant Storm who blew the comment off as a tasteless joke.

g. Defendant Helt referred to all African Americans as pieces of shit.

h. Defendant Helt said her fiancé did not deal with certain types of people, in reference to African Americans.

83. Not only did Plaintiff report these incidents to Defendant Gross, but Defendant Gross also witnessed many of them. Defendant Gross did report these incidents to the EEO but failed to disclose that she was also a witness. And instead of intervening, Defendant Gross told Plaintiff to learn to stand up for herself.

84. The incidents of racial discrimination continued and even though Plaintiff reported them, nothing was done.

85. Defendants Gross and Hawk began to retaliate against Plaintiff. They made Plaintiff a permanent clerk in the courtroom without rotation amongst the other clerks.

86. Defendants also disregarded Plaintiff's ADA accommodation. Plaintiff suffered from blood clots in her legs and was not supposed to sit for long periods of time and needed breaks to stand. When Plaintiff was placed in the courtroom, she was forced to sit for long periods of time.

Upon information and belief, Defendants intentionally placed her in the courtroom and purposefully disregarded her ADA accommodation.

87.     Upon information and belief, Defendants purposely did not train Plaintiff to effectively perform her job duties. During her employment at Salem Courthouse, Plaintiff was only trained on small claims complaints; only a small portion of what she needed to know to perform her job.

88.     Defendants Rubino and Helt learned of Plaintiff's EEO complaint after they were contacted by Human Resources. After finding out about Plaintiff's complaints, Plaintiff's co-workers began retaliating against her more. They would criticize Plaintiff's work and make false accusations to management about her. Defendants Rubino and Helt told Plaintiff that they were going to file a grievance against her.

89.     On or about April 29, 2019, management transferred Plaintiff to the Gloucester County Courthouse.

90.     Plaintiff was advised that she would be Judge Chell's permanent clerk. Management was aware that Plaintiff required an accommodation under the ADA and was restricted from sitting for long periods. However, management failed to provide Plaintiff with an accommodation.

91.     Plaintiff was told by her co-workers that they heard about her from Salem.

92.     Defendant Hinman was supposed to train Plaintiff. However, instead of training Plaintiff, Defendant Hinman would treat Plaintiff in a hostile manner.

93.     She would instruct Plaintiff when she could take her lunch, would constantly question Plaintiff's actions or where she was going. Defendant Hinman would even question Plaintiff's whereabouts when she went to the restroom.

94.     Plaintiff's other co-workers also treated Plaintiff in a hostile manner. Just like in Salem, they would criticize Plaintiff's work and make false accusations to management about her.

95.    In or around October 2019, Plaintiff took a 3 month leave of absence because the severe harassment she was experiencing at work.

96.    Defendants' treatment of Plaintiff caused her severe depression and anxiety.

97. The actions of Defendants have caused Plaintiff to suffer substantial shame, embarrassment, and mental anguish.

## IV.    CAUSES OF ACTION

### COUNT I
#### Title VII – Sexual Harassment, Hostile Work Environment & Retaliation
*Plaintiff v. State of New Jersey & New Jersey State Judiciary*

98.    Plaintiff incorporates all prior paragraphs as if fully set forth at length herein.

99.    Plaintiff, Natalie Spence is a member of a protected class being an African-American female.

100.    Defendants, through their actions and inactions, subjected Plaintiff to sexual harassment and a hostile work environment.

101.    Defendants possessed information of prior sexual harassment by Defendant, Callender and failed to take steps to prevent and/or stop the sexual harassment of Plaintiff.

102.    Defendants' employee-supervisor Kiersnowski gave Plaintiff, Natalie Spence a sub-par initial assessment that, upon information and belief, remains in Plaintiff's permanent employee file to the detriment of Plaintiff's career progression.

103.    Defendants' employer-supervisor Williamson transferred Plaintiff, Natalie Spence on multiple occasions rather than addressing Defendant, Callender's sexual harassment of Plaintiff; placing Plaintiff in a poor light with fellow co-workers and other supervisors to the detriment of Plaintiff's career progression.

104.     Each reassignment included significantly different responsibilities that Plaintiff, Natalie Spence had to adapt to detrimentally affecting Plaintiff's mental and emotional state and Plaintiff's career progression.

105.     Defendants through the foregoing actions created a hostile work environment that Plaintiff suffered until her transfer to Salem County Superior Court.

106.     Defendant, Callender's sexual harassment of Plaintiff was severe, pervasive, and regular, as well the hostile environment created by Defendants in failing to stop the sexual harassment and affirmative actions in making Plaintiff to appear to other supervisors and co-workers as the "problem employee".

107.     As a direct and proximate result of Defendants' violation of Title VII, Plaintiff, Natalie Spence had sustained the injuries, damages, and losses set forth herein and have incurred attorneys' fees and costs.

108.     Plaintiff, Natalie Spence is suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' actions unless and until this Court grants the relief requested herein.

109.     All conditions precedent, including the EEOC Rights to Sue, have been satisfied. See Exhibits A and B.

## COUNT II
New Jersey Law Against Discrimination –
Sexual Harassment, Hostile Work Environment & Retaliation
*Plaintiff v. NJ State Judiciary, John Callender, Cornell Williamson, and* Renata Kiersnowski

110.     Plaintiff incorporates all prior paragraphs as if fully set forth at length herein.

111.     For the reasons set forth above, Defendants violated the New Jersey Law Against Discrimination.

## COUNT III

## 42 U.S.C. § 1981
## DISCRIMINATION BASED ON RACE
*Plaintiff v. NJ State Judiciary, Kelly Helt, Karen Rubino, Elisabeth Storm, Stephanie Hawk, Gloria Gross and Maria Hinman*

112.     The above paragraphs are hereby incorporated herein by reference.

113.     Defendants evidenced a settled intent to discriminate against and wrongfully target Plaintiff on the basis of her race.

114.     Discriminatory acts and harassment were undertaken because of the color of her skin.

115.     The aforesaid conduct of Defendants was intentional and undertaken in reckless disregard for the federally protected civil rights of Plaintiff.

116.     The foregoing actions of Defendants created a hostile work environment that was severe and pervasive and that altered the terms and conditions of Plaintiff's employment.

117.     As a result of the said violation of 42 U.S.C. § 1981, Plaintiff has suffered racial discrimination, humiliation, embarrassment, financial loss and other harms, and is entitled to entry of judgment in his favor, and against Defendants, together with an award of declaratory and injunctive relief, damages, and ancillary relief as provided by 42 U.S.C. § 1988.

## COUNT IV
## VIOLATION OF TITLE VII-RACE BASED DISCRIMINATION
*Plaintiff v. NJ State Judiciary*

118.     The foregoing paragraphs are hereby incorporated herein by reference.

119.     By committing the foregoing acts of discrimination against Plaintiff, Defendants have violated Title VII.

120.     Said violations were done with malice and/or reckless indifference and warrant the imposition of punitive damages.

121.     As a direct and proximate result of Defendants violation of Title VII, Plaintiff has suffered the damages and losses set forth herein and has incurred attorney's fees and costs.

122.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants discriminatory acts unless and until this Court grants the relief requested herein.

### COUNT V
### REFUSAL TO REASONABLY ACCOMMODATE – ADA
*Plaintiff v. NJ State Judiciary, Kelly Helt, Karen Rubino, Elisabeth Storm, Stephanie Hawk, Gloria Gross and Maria Hinman*

123.    The above paragraphs are incorporated herein by reference.

124.    Plaintiff is an individual with a disability as the term is defined in Section 3(2) of the ADA, 42 U.S.C. Section 12102(2). Plaintiff has/had deep vein thrombosis in her legs, which substantially limits one or more of his major life activities, has a record of such impairment and is regarded by Defendants as having impairment.

125.    Defendants failed to make reasonable accommodations to Plaintiff.

126.    Defendants failure to make reasonable accommodations to Plaintiff's disability constitutes discrimination against Plaintiff with respect to the terms, conditions or privileges of her employment. Defendants failure to act is in violation of Section 102(b)(5)(A) of the ADA, 42 U.S.C. Section 12112(b)(5)(A).

127.    As a direct and immediate result of Defendants Discrimination on the basis of disability, Plaintiff has suffered lost benefits and lost employment opportunities and is entitled to damages.

### COUNT VI
### ADA RETALIATION
*Plaintiff v. NJ State Judiciary, Kelly Helt, Karen Rubino, Elisabeth Storm, Stephanie Hawk, Gloria Gross and Maria Hinman*

128.     The foregoing paragraphs are incorporated herein by reference.

129.     In addition and/or in the alternative, the foregoing adverse employment actions taken against Plaintiff constituted retaliation for Plaintiff's lawful requests and exercise of rights under the ADA.

**COUNT VII**
**New Jersey Law Against Discrimination –**
**Race, Disability, Hostile Work Environment & Retaliation**
*Plaintiff v. NJ State Judiciary, Kelly Helt, Karen Rubino, Elisabeth Storm, Stephanie*
*Hawk, Gloria Gross and Maria Hinman*

130.     Plaintiff incorporates all prior paragraphs as if fully set forth at length herein.

131.     For the reasons set forth above, Defendants violated the New Jersey Law Against Discrimination.

## IV.     PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Natalie Spence seeks damages and legal and equitable relief in connection to Defendants' unlawful conduct and specifically prays that this Court grant the following relief to Plaintiff:

a)      declaring the acts and practices complained of herein to be in violation of Title VII and/or the New Jersey Law Against Discrimination; the ADA; and 42 U.S.C. §1981.

b)      enjoining and permanently restraining the violations alleged herein;

c)      entering judgment against the Defendants and in favor of Plaintiff in an amount to be determined;

d)      awarding compensatory damages to make Plaintiff whole for all lost earnings, earning capacity and benefits, past and future, which Plaintiff has suffered or may suffer in the future as a result of Defendants' unlawful conduct;

e)      awarding compensatory damages for Plaintiff for past and future pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's

pleasures, which Plaintiff has and will continue to suffer as a result of
Defendants' improper conduct

f)    awarding punitive damages to Plaintiff;

g)    awarding Plaintiff, the costs of suit, attorneys' fees; and,

h)    granting such other and further relief as this Court may deem just, proper, or
equitable including other equitable and injunctive relief providing restitution
for past violations and preventing future violations.

Respectfully Submitted,

**WEISBERG LAW**                          **SCHAFKOPF LAW, LLC**

_/s/ Matthew B. Weisberg_                 _/s/ Gary Schafkopf_
Matthew B. Weisberg, Esquire              Gary Schafkopf, Esquire
*Attorney for Plaintiff*                  *Attorney for Plaintiff*

---

| | | |
|---|---|---|
| **NATALIE SPENCE** | : | |
| | : | |
| v. | : | No.: 19-21490-NLH-KMW |
| | : | |
| **STATE OF NEW JERSEY**, *et al.* | : | |

---

## CERTIFICATE OF SERVICE

I, Matthew B. Weisberg, Esquire, hereby certify that on this 12th day of May, a true and correct copy of the foregoing Second Amended Complaint was served via ECF upon the following:

DAVEON MAXICI GILCHRIST
JOHN P. CASCIO
STATE OF NEW JERSEY
OFFICE OF THE ATTORNEY GENERAL
25 MARKET ST
PO BOX 112
TRENTON, NJ 08625

**WEISBERG LAW**

*/s/ Matthew B. Weisberg*
Matthew B. Weisberg, Esquire
NJ Attorney ID #: 015652000
7 S. Morton Avenue
Morton, PA 19070
(610) 690-0801
(610) 690-0880 – Fax
mweisberg@weisberglawoffices.com
*Attorney for Plaintiff*
